# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

POLICEMEN'S BENEVOLENT AND )
PROTECTIVE ASSOCIATION OF )
ILLINOIS, UNIT 156-SERGEANTS and )    **No. 17 C 8469**
STEPHEN FRANKO, )
                              )    **Judge Jorge L. Alonso**
        **Plaintiffs,** )
                              )
    **v.** )
                              )
CITY OF CHICAGO, )
                              )
        **Defendant.** )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, Chicago police sergeant Stephen Franko and his union, the Policemen's Benevolent and Protective Association of Illinois, Unit 156-Sergeants ("PBPA"), bring this suit against defendant, the City of Chicago, claiming that the City violated Franko's due process rights by suspending him from his job without pay and putting off his post-suspension hearing indefinitely. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court grants defendant's motion and denies plaintiffs' motion.

## I.    BACKGROUND

On the evening of October 20, 2014, Chicago police officer Jason Van Dyke shot and killed Laquan McDonald. (Pls.' LR 56.1(b) Resp. ¶ 9, ECF No. 85; Def.'s LR 56.1(b) Resp. ¶ 17, ECF No. 84; *see* Compl. Ex. D, Jun. 12, 2017 Police Bd. Mem. & Order at 3, ECF No. 1-4.) Franko was the assigned street supervisor of several of the officers who were present at the scene of the shooting, and he responded to the scene himself in its aftermath, having heard the events unfold over the radio. (Def.'s LR 56.1 Stmt. Ex. A, Jun. 13, 2016 Franko Interview Tr. 21:5-22:5, 25:8-23, 39:9-40:15, 28:4-29:15, ECF No. 82.) Franko did not witness the shooting, but, as a supervisor

who had responded to the scene, he subsequently reviewed and approved reports submitted by some of the other officers who were on the scene. (*Id.* at 73:13-74:1, 78:12-82:23, 83:11-86:3, 90:2-91:3, 96:6-19; *id.*, Ex. B, Aug. 2, 2016 Franko Interview Tr. 21:11-22:9.)

On November 24, 2015, Van Dyke was criminally charged in the McDonald shooting. (Pls.' LR 56.1(b) Resp. ¶ 9; Def.'s LR 56.1(b) Resp. ¶ 17.) Chicago Police Department authorities subsequently referred an internal investigation into the shooting and related misconduct to the City's Office of the Inspector General ("OIG"). (Mot. to Suppl. Summ. J. Stmts., Ex. 1, Jul. 18, 2019 Police Bd. Findings & Decisions at 12, ECF No. 95-1.) On May 13, 2016, the OIG served Franko with a Notification of Interview, which informed him that he would be required to appear and answer OIG's questions concerning "Sergeant Franko's participation in the drafting and review of false Tactical Response Reports and Officer's Battery Reports and incompetent supervision of his subordinates." (Def.'s LR 56.1 Stmt. Ex. A., Jun. 13, 2016 Franko Interview Tr., Ex. 2, Notification of Interview, ECF No. 82 at 182.) On the same date, OIG served Franko with a Notification of Allegations, which informed him that the interim superintendent of the Chicago Police Department had requested an investigation into certain "allegations arising out of the October 20, 2014 shooting death of Laquan McDonald" and the conduct of Chicago police officers in connection with the incident. (Pl.'s LR 56.1(b) Resp. ¶¶ 11-12; Def.'s LR 56.1 Stmt. Ex. A., Jun. 13, 2016 Franko Interview Tr., Ex. 3, Notification of Allegations, ECF No. 82 at 183-85.) The document listed twelve paragraphs of allegations against Franko, including allegations that, on October 20 or 21, 2014, he assisted officers in drafting false reports concerning the encounter with McDonald, or directed them to draft false reports; that he reviewed and approved reports submitted by Van Dyke and Joseph Walsh, Van Dyke's partner on the night in question, concerning the encounter with McDonald; and that he failed in his duties as a supervisor on the

night of October 20, 2014, in the above-described ways and by failing to ensure that the in-car video systems in the cars of the officers he supervised were working properly. (*Id.*) On May 13, 2016, in the presence of a witness, Franko signed both the Notification of Interview and the Notification of Allegations to confirm that he had received them. Along with the Notifications, he also received copies of the allegedly false reports on which the allegations against him were premised. (Jun. 13, 2016 Franko Interview Tr. at 15:15-19:3.) Further, he received in-car videos taken from police vehicles at the scene of the McDonald shooting as well as video from a Dunkin Donuts security camera, which he acknowledged reviewing before his interview. (*Id.* at 19:4-20.)

On June 13, 2016, OIG investigators interviewed Franko. (Pls.' LR 56.1(b) Resp. ¶ 14; *see* Def.'s LR 56.1 Stmt. Ex. A, Jun. 13, 2016 Franko Interview Tr.) Franko was represented by counsel during the interview. (Jun. 13, 2016 Franko Interview Tr. at 5:5-6.) Investigator Peter Neumer began by reading Franko his administrative rights, asking him if he understood them, and asking him to sign a written "Advisement of Rights" form. (*Id.* at 6:7-10:4; *id.*, Ex. 1, Advisement of Rights, ECF No. 82 at 181) Franko acknowledged that he understood that he was required to answer all questions truthfully, he would be ordered to do so by a superior officer if he refused, and any statement he made could be used as evidence of misconduct or as the basis for disciplinary action against him, up to and including removal or discharge. (*Id.* at 6:7-10:4.)

Next, Investigator Neumer asked Franko, "Do you have a statement you would like to put on the record now?" (*Id.* at 10:9-10.) Franko answered, "I respectfully decline to answer your questions unless I am ordered to do so." (*Id.* at 10:11-12.) Neumer called a Chicago police commander, who ordered Franko to answer the investigators' questions. (*Id.* at 10:13-11:20.)

Neumer subsequently asked Franko about the police reports of the McDonald shooting, verifying that he had reviewed and approved them on October 20 or 21, 2014, and he asked Franko

numerous questions about what Franko remembered from that night. He then directed Franko's attention to the Notice of Allegations, reviewed each of the eleven paragraphs of substantive allegations with him (the twelfth paragraph merely added that Franko was incompetent in the performance of his duties "in the ways enumerated in allegations 1 through 11" (*id*., Ex. 3, ECF No. 83 at 184)), and asked Franko for his response. (*Id.* at 101:6-110:2, 144:23-146:3.) Franko responded that the allegations were untrue. At the conclusion of the interview, Investigator Neumer asked Franko, "if you feel like there is any area we didn't cover, any questions that we should have asked but didn't, or just other information that you think we should know, we want to give you the opportunity on the record to state any additional information you think we should know." (*Id.* at 156:8-14.) Franko answered, "No, I think you guys covered everything." (*Id.* at 156:15-16.)

On July 23, 2016, Franko received another Notification of Interview and Notification of Allegations, this time concerning his review and approval of another officer's allegedly false Original Case Incident ("OCI") Report of the McDonald shooting. (*Id.*, Ex. B, Aug. 2, 2016 Franko Interview Tr., Exs. 2-3, ECF No. 82 at 269-71.) On August 2, 2016, OIG investigators interviewed Franko about this report and asked follow-up questions about matters they had covered in his earlier June 2016 interview. (*See generally id.*, Ex. B, Aug. 2, 2016 Franko Interview Tr.) The parties followed a similar process: they read through and signed an Advisement of Rights form; the examining investigator twice asked Franko if he had any "statements" or "remarks" to make before the substance of the questioning began (*id.* at 9:2-12, 12:3-18), to which he and his counsel replied that Franko was still answering questions under "duress" because he had been given a direct order to do so by a superior officer; they reviewed the OCI report in question and the Notification of Allegations concerning it; Franko answered questions about what he

remembered from the night of the McDonald shooting in connection with the OCI report and its contents; and at the end of the questioning, the examining investigator asked Franko, "So do you have any questions for us or anything to add based on what we've asked today or in your previous interview," in response to which Franko's counsel asked a few questions to "try to clarify" a few issues (*id.* at 43:24-46:6).

On August 30, 2016, the Superintendent of Police filed charges with the City's Police Board against Van Dyke and four others, including Franko, recommending that all five officers be discharged for actions taken in connection with the McDonald shooting and its aftermath. (Pls.' LR 56.1(b) Resp. ¶ 24; Def.'s LR 56.1(b) Resp. ¶ 19.) On or about September 1, 2016, Franko was served with a Suspension Notification, informing him that he would be suspended without pay for a period of thirty days for violations of "Rules 2, 3, 6, 11, and 14 of the Chicago Police Department," pending a "separation" hearing, "at which hearing the original disciplinary action taken by the Superintendent [*i.e.*, the suspension] will also be reviewed." (Pls.' LR 56.1(b) Resp. ¶ 24; Def.'s LR 56.1(b) Resp. ¶¶ 20-21; Compl. Ex. B, Suspension Notification, ECF No. 1-2.) On September 7, 2016, a Hearing Officer for the Chicago Police Board submitted a memorandum stating that a continuing suspension beyond thirty days without pay was warranted, pending disposition of the Board's charges against him. (Pls.' LR 56.1(b) Resp. ¶ 29; Def.'s LR 56.1(b) Resp. ¶ 26.)

The parties engaged in discovery and exchanged thousands of pages of documents in preparation for the hearing. (Pls.' LR 56.1(a) Resp. to Def.'s Stmt. of Add'l Facts ¶ 1, ECF No. 94; Def.'s LR 56.1(b)(3)(C) Stmt. of Add'l Facts, Ex. 1, Tr. of Dec. 1, 2016 Status Hr'g, ECF No. 84-1.) But on January 5, 2017, before any hearing had been held, Patricia Brown Holmes, the Special Prosecutor appointed to investigate criminal wrongdoing in connection with the McDonald

shooting, moved to intervene in the Police Board proceedings against Franko, Van Dyke, and the three other officers, seeking a stay pending the outcome of the ongoing grand jury investigation and resulting prosecutions. (Pls.' LR 56.1(b) Resp. ¶ 24; Def.'s LR 56.1(b) Resp. ¶ 28.) The Special Prosecutor argued that "a stay was critical to protecting the constitutional rights of the officers involved, and particularly their right not to have statements they made to investigators, on pain of their discharge, . . . publicized in connection with the Police Board proceedings," as such statements "are inadmissible in criminal court under *Garrity v. New Jersey*, 385 U.S. 493 (1967)," and, "in her criminal prosecution, [they] cannot be used, nor can information garnered from the coerced statements be used against the officers." (*See* Compl. Ex. D, Jun. 12, 2017 Police Bd. Mem. & Order at 4, ECF No. 1-4.) On January 10, 2017, the judge presiding over Van Dyke's criminal case entered an order recommending that the Police Board stay proceedings against Van Dyke pending completion of the criminal proceedings against him, "subject to the due process rights of the police officers involved as well as the due process of the prosecution." (Pls.' LR 56.1(b) Resp. ¶ 32; Def.'s LR 56.1(b) Resp. ¶ 29; *see* Compl. Ex. D, Jun. 12, 2017 Police Bd. Mem. & Order at 4, ECF No. 1-4.) On May 17, 2017, Van Dyke filed his own motion for a stay, arguing that "the publication of *Garrity*-protected statements, which the Superintendent intends to use as evidence in the Police Board cases, would pose a serious or imminent threat of further public condemnation in his case and prejudice him in his upcoming criminal trial." (Jun. 12, 2017 Police Bd. Mem. & Order at 5.)

On June 12, 2017, the Police Board granted the motions to stay. The Board explained that it was "quite clear" that the Superintendent would "rely extensively on the *Garrity*-protected and coerced statements all five of the respondents made during the investigation of the shooting of Mr. McDonald," which, because Police Board proceedings are public and the McDonald shooting had

attracted considerable media attention, would expose "prosecutors[,] . . . grand jurors, regular jurors, and/or witnesses in the criminal case or cases . . . to these *Garrity*-protected statements" through the media. (*Id.* at 8.) This was particularly dangerous to Van Dyke's criminal case and any case the Special Prosecutor might bring against any of the other officers because, not only are prosecutors prohibited from introducing *Garrity*-protected statements against criminal defendants, they are prohibited from using them more broadly, so they must be able to show that they have an "independent source for all of the information the prosecutor intends to offer in the criminal case." (*Id.* at 7.) Further, the Police Board reasoned, "the courts have ruled that if a prosecutor, grand juror, jury member, or witness is exposed to the contents of a *Garrity*-protected statement, through the media or otherwise, the police officer's criminal case [may] be tainted and the charges against him or her . . . dismissed." (*Id.* at 7 (citing *United States v. Cozzi*, 613 F.3d 725, 728 (7th Cir. 2010) and *United States v. North*, 910 F.2d 843, 854-73 (D.C. Cir. 1990), *partially withdrawn on other grounds*, 920 F.2d 940 (D.C. Cir. 1990), *cited in Cozzi*, 613 F.3d at 731).) The Police Board recognized that its "highest duty is to ensure that justice is done in cases where officers are accused of misconduct, and thereby instill public confidence in the Board's disciplinary proceedings and in the criminal justice system," and it found that there was a "substantial risk that if the Police Board cases were to go ahead, media reporting of the evidence in those cases [would] make it more difficult for criminal prosecutors to prosecute the criminal proceedings and may result in a violation of the Respondents' constitutional rights," which would "prejudice and potentially jeopardize the criminal proceedings." (*Id.* at 1-2.) "Given the importance of the criminal cases involving Mr. McDonald to our city," the Police Board reasoned, "it would be a disservice to all . . . to go forward with the Police Board discharge cases" at a time when doing so might "prejudice

or jeopardize" the Van Dyke criminal case and any related cases the Special Prosecutor might bring. (*Id.* at 7-8.)

However, the Police Board also recognized that, in general, "an administrative agency may not indefinitely postpone its adjudication of cases" in which a legitimate property interest is at stake "without offending the Due Process clauses of the U.S. and Illinois constitutions." (*Id.* at 9.) Because Illinois law provides that Chicago police officers cannot be discharged except for cause, the charged officers all had a property interest in their jobs, which interest was harmed by the postponement of their hearings as well as their ongoing suspensions without pay. (*Id.*) Van Dyke had already been indicted and had the right to hasten the conclusion of his criminal proceedings by demanding a speedy trial, but he had not done so, so the Police Board determined that the stay would not raise sufficient due process concerns to warrant lifting or altering the terms of his suspension. (*Id.* at 10-11.) But because Franko and the other charged officers had not been indicted and there was nothing to indicate when they might be, the Police Board found that "continu[ing] their suspensions without pay during the duration of the indefinite stay of their discharge cases" might violate their due process rights. (*Id.* at 9-10.) Therefore, the Police Board vacated the Hearing Officer's determination that their cases warranted extended suspensions of longer than thirty days, paving the way for their reinstatement while they awaited the conclusion of the ongoing criminal proceedings and the resumption of their discharge cases. (*Id.* at 10-11.)

Franko was reinstated to active duty at full pay within days, but he did not receive back pay for the nine months he was suspended. (Def.'s LR 56.1(b) Resp. ¶¶ 37-41.) On July 18, 2017, the PBPA filed a grievance on Franko's behalf, challenging the City's refusal to pay him during his suspension and requesting back pay, but the City denied the grievance at the third stage on August 17, 2017. (*Id.* ¶¶ 43-47.) On October 23, 2017, the Police Board issued an order as

"clarification" of its June 12, 2017 Memorandum and Order, explaining that it had not held that the unindicted officers' suspensions were unwarranted from the outset; it had merely ruled that, based on intervening circumstances that prevented a reasonably prompt hearing, their suspensions were no longer warranted. (Pls.' LR 56.1(b) Resp. ¶ 42, *see* Mem. in Supp. of Def.'s Mot. to Dismiss, Ex. 1, Police Bd. Oct. 23, 2017 Clarification of Mem. & Order, ECF No. 28-1.) The Police Board had intended its June 12 Order to operate only "prospectively," not to reinstate the unindicted officers retroactively to the date their suspensions were initially imposed; indeed, the Police Board noted, the officers had not even requested that relief prior to the entry of the June 12 Order. (Clarification Order at 3-4.)

On November 14, 2017, the Special Prosecutor announced that the grand jury investigation had concluded and it would issue no more indictments. (Def.'s LR 56.1(b) Resp. ¶¶ 51.) On October 5, 2018, Van Dyke was convicted in his criminal case. On November 29, 2018, the Police Board lifted the stay of the unindicted officers' discharge cases. (*See* Jul. 18, 2019 Police Bd. Findings & Decisions at 2.) The cases were consolidated, and a hearing took place from April 10 to April 12, 2019. (*Id.*) On July 18, 2019, the Police Board found Franko guilty of violating Chicago Police Department Rules 2, 3, 6, 11, and 14 by approving reports that were shown to be false by video evidence of the McDonald shooting, and by failing to monitor his subordinates to ensure that they properly used the audio components of their in-car video systems. (*Id.* at 7-23, ¶¶ 5-14.) The Police Board determined that these violations constituted cause for removal, and it ordered that he was to be immediately discharged from employment. (*Id.* at 50.)

## II.     STANDARD ON A MOTION FOR SUMMARY JUDGMENT

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (court must enter summary judgment against a party who "'does not come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question'") (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). The Court construes all evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court applies these "ordinary standards for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Reeder v. Carter*, 339 F. Supp. 3d 860, 869-70 (S.D. Ind. 2018).

## III.    DISCUSSION

The Fourteenth Amendment protects against deprivations of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV. "To demonstrate a procedural due process violation, the plaintiffs must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Hudson v. City of Chi.*, 374

F.3d 554, 559 (7th Cir. 2004) (quoting *Buttitta v. City of Chi.,* 9 F.3d 1198, 1201 (7th Cir. 1993)).

It is well-established (and neither party disputes) that "Chicago police officers . . . have a property

interest in their continued employment," *Hudson*, 374 F.3d at 559, because, under state law, they

cannot be "removed or discharged, or suspended for more than 30 days, except for cause upon

written charges and after an opportunity to be heard in [their] own defense by the Police Board,"

65 ILCS 5/10-1-18.1. *See Confederation of Police v. City of Chi.*, 547 F.2d 375, 376 (7th Cir.

1977) ("[T]he existence of a property interest in public employment cognizable under the due

process clause depends on whether state law has affirmatively created an expectation that a

particular employment relationship will continue unless certain defined events occur.") *quoted in*

*Hudson*, 374 F.3d at 559.

"Once it is determined that due process applies, the question remains what process is due."

*Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Due process is "'flexible and calls for such

procedural protections as the particular situation demands.'" *Mathews. v. Eldridge*, 424 U.S. 319,

334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1961)); *see also Grant v. Trs. of Ind.*

*Univ.*, 870 F.3d 562, 571 (7th Cir. 2017). In determining what process is due, a court considers

the following three factors:

> First, the private interest that will be affected by the official action; second, the risk
> of an erroneous deprivation of such interest through the procedures used and the
> probable value, if any, of additional or substitute procedural safeguards; and finally,
> the Government's interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural requirements
> would entail.

*Mathews*, 424 U.S. at 335; *see also Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997) (applying the

three-factor *Mathews* test to a suspended officer's due process claim).

Plaintiffs argue that defendant violated Franko's due process rights because (a) it provided

him with no pre-deprivation hearing before suspending him without pay for nine months, and (b)

it unreasonably delayed his post-suspension hearing, leaving him with no chance to tell his side of the story until April 2019.

### A. Pre-Deprivation Due Process

"An essential principle of due process is that a deprivation of life, liberty, or property be *preceded* by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (emphasis added). In cases in which the property interest at stake is continued employment, if "substantial post-deprivation process is available, the pre-deprivation process. . . often need not be elaborate or extensive." *Hudson*, 374 F.3d at 560. "Rather, in many situations, it 'should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Gilbert*, 520 U.S. at 929 (quoting *Loudermill*, 470 U.S. at 545-46). Thus, in *Loudermill*, the Supreme Court explained that, where a government employer has a strong interest in "quickly removing an unsatisfactory employee," and where substantial "post-termination administrative procedures" are available, then the employee may be due no more pre-termination process than "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 U.S. at 546.

Defendant argues that the process Franko received in the course of the OIG investigation satisfied *Loudermill*'s requirements for pre-deprivation due process because Franko had notice of the charges against him, he was informed of the evidence supporting them, and he had an opportunity to present his side of the story before he was suspended. *See D'Acquisto v. Washington*, 750 F. Supp. 342, 348-49 (N.D. Ill. 1990) (citing *Loudermill*, 470 U.S. at 545-46)

(Chicago police officers received sufficient pre-deprivation due process during "interrogation" process performed by internal investigators).

The Court agrees with defendant. Months before his suspension, Franko received the Notification of Allegations, which described in detail what Franko was alleged to have done wrong in connection with the McDonald shooting, along with copies of the allegedly false police reports and the video of the incident tending to show that they were false. Franko then sat down for an interview with investigators, during which he acknowledged that he knew his statements could form the basis for disciplinary action against him, up to and including removal or discharge. He was asked twice, both toward the beginning and again toward the end of the interview, whether he wanted to make a statement for the record, and both times he declined. During the interview, the OIG investigator went through each paragraph of the allegations with Franko in detail, giving him an opportunity to respond to each one. A month later, Franko received another Notification of Allegations stemming from his approval of another allegedly false police report on the night of the McDonald shooting, and a similar process played out, with Franko sitting down for an interview to discuss the allegations, during which he was asked if he had any statement to make or anything to say in response. It was only after these interviews that Franko was charged with misconduct that warranted suspension, pending a separation hearing. It is clear from these facts that Franko received "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to his suspension, just as the law requires. *See Loudermill*, 470 U.S. at 546.

Plaintiffs object to defendant's reliance on the interview transcripts and related materials, arguing that defendant never disclosed these materials in discovery as evidence supporting their position, nor did it give plaintiffs any indication that it would rely on them until it filed its motion

for summary judgment. While this may be true, Franko can hardly claim to be surprised or prejudiced by evidence of interviews he himself gave while represented by counsel in the very matter that is the subject of this suit. Because there is no surprise, prejudice, or harm to plaintiffs in defendant's reliance on evidence of which plaintiffs were well aware, the Court declines to exclude the evidence. *See Nunnery v. Sun Life Fin. Distributors Inc.*, 570 F. Supp. 2d 989, 993 (N.D. Ill. 2008) (declining to strike evidence produced late when plaintiff admitted he was already aware of it).

Plaintiffs also argue that the OIG investigation cannot have provided pre-suspension due process because it was not conducted by the same entity that imposed the suspension; the relationship between the City's OIG and its police department, plaintiffs argue, was not apparent, so Franko could not have connected it with discipline the Police Board might impose. But the evidence does not support this argument. The Notification of Allegations that Franko received clearly disclosed that the OIG's investigation was conducted at the behest of the Superintendent of Police, and the Advisement of Rights informed him that his statements could be used as the basis for disciplinary action, "up to and including removal or discharge." No evidence supports any conclusion that the OIG was operating in some sort of separate silo within the City government than the police department; to the contrary, the evidence undermines that conclusion. Nor does the Court see any constitutional infirmity in the Superintendent's decision to delegate the pre-suspension interviews to OIG, as "the Constitution does not entitle an employee to a pre-termination hearing in front of the ultimate decisionmaker." *Powers v. Richards*, 549 F.3d 505, 512 (7th Cir. 2008).

The City afforded Franko sufficient notice of the allegations, an explanation of the evidence, and an opportunity to respond prior to suspending him, which met the requirements of pre-deprivation due process.

## B. Post-Deprivation Due Process

Although the requirements of due process are fluid and depend on the circumstances of each case, an employee who receives only an "abbreviated," informal pre-deprivation hearing is likely to be entitled to a "substantially more meaningful," more formal post-deprivation hearing. *Jones v. Bd. of Educ. of Twp. High Sch. Dist. No. 211, Cook Cty., Ill.*, 651 F. Supp. 760, 767 (N.D. Ill. 1986) (Shadur, J.) (internal quotations marks omitted) (citing *Carter v. W. Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 (6th Cir. 1985)). Under such circumstances, the post-deprivation hearing generally must be held "prompt[ly]" and "without appreciable delay." *See Barry v. Barchi*, 443 U.S. 55, 66 (1979); *see also Hassel v. Neal*, No. Civ.A. 96-813, 1997 WL 269575, at *3 (E.D. Pa. May 16, 1997) ("The existence of a pretermination opportunity to respond does not excuse [a government employer's failure] to afford a prompt post-termination remedy.") (citing *Loudermill*, 470 U.S. at 547, 547 n.12) ("At some point, a delay in the post-termination hearing would become a constitutional violation.").

Determining when a delay becomes long enough to offend due process requires "examin[ing] [1] the importance of the private interest and the harm to this interest occasioned by delay; [2] the justification offered by the Government for delay and its relation to the underlying governmental interest; and [3] the likelihood that the interim decision may have been mistaken." *See FDIC v. Mallen*, 486 U.S. 230, 242 (1988); *Jones v. City of Gary, Ind.*, 57 F.3d 1435, 1444 (7th Cir. 1995) (applying *Mallen* factors); *DeVito v. Chi. Park Dist.*, 972 F.2d 851, 855 (7th Cir. 1992) (same).

Defendant argues that, although it is true that Franko's wait for his post-suspension hearing[1] was long, the delay was justified by the circumstances and the City always acted with appropriate regard for Franko's due process rights. The Court agrees with defendant that, when the relevant factors are weighed against one another, the City acted within the bounds of due process.

### 1. Delay during unpaid suspension

The Supreme Court has "frequently recognized the severity of depriving a person of the means of livelihood," *Loudermill*, 470 U.S. at 543 (citing cases), and it follows that an employee's private "interest in continued employment" is an "important" one that "ought not be interrupted without substantial justification," *Mallen*, 486 U.S. at 243. In this case, the harm to Franko's private interest in his continued employment was at its most severe—and the City's burden to hold a prompt post-deprivation hearing weighed most heavily—during the approximately nine-month period from September 2016 to June 2017 when Franko was suspended without pay.

A suspension without pay need not be followed by an immediate post-suspension hearing, so long as the suspension is "justified by an important government interest coupled with factors minimizing the risk of an erroneous deprivation." *Id.*; *see DeVito*, 972 F.2d at 855-58 (delay of approximately a year caused by "administrative bottleneck" did not violate due process where employee who was suspended without pay had received an "adequate pre-deprivation hearing"). There is a strong governmental "interest in preserving public confidence in [the] police force" by taking appropriately swift and severe disciplinary action—including unpaid suspension—when

---

[1] At certain points, plaintiffs seem to argue that Franko never received anything properly characterized as a "post-suspension hearing"; rather, he received a "separation hearing." But the evidence plainly shows that his April 2019 hearing served as both, just as the Suspension Notification Franko received had informed him. The Police Board reviewed Franko's conduct to determine whether discipline was warranted, and because it found him guilty, it had no need to address whether the suspension was proper, which went without saying.

police officers are accused of serious misconduct, given that they "occupy positions of great public trust and high public visibility." *See Gilbert*, 520 U.S. at 932. Critically, in this case, the evidence shows that the risk of erroneous deprivation was slight because the OIG conducted a thorough investigation including two interviews with Franko, during which it reviewed the allegations against him, questioned him about them in detail, and gave him an opportunity to respond. This thorough investigation minimized the risk that the allegations were unfounded—a risk that, given the City's possession of police reports that were approved by Franko and contradicted by video, was slight in any event.

Further, the evidence shows that the parties were conscientiously exchanging discovery and reviewing voluminous documentary evidence as late as December 1, 2016, in a good-faith effort to prepare for a postsuspension hearing (Pls.' LR 56.1(a) Resp. ¶ 1), so any failure to hold the hearing in the early months of Franko's suspension was not based on an undue delay. *See DeVito*, 972 F.2d at 855-56. The Supreme Court has stated that a nine-month wait for a post-deprivation hearing is not unconstitutional *per se*, *Loudermill,* 470 U.S. at 547, and the evidence does not reveal any undue delay in Franko's proceedings that would make his nine-month period of suspension while he awaited a hearing unconstitutional in this case. Given the minimal risk of erroneous deprivation, and particularly given the public outrage inspired by the McDonald shooting, the government interest in preserving public confidence in the police force sufficiently outweighed Franko's private interest in his livelihood to justify a nine-month delay in holding his post-suspension hearing while he remained suspended without pay.

### 2. Delay after suspension was vacated and disciplinary proceedings stayed

In early January 2017, the Special Prosecutor filed her motion to stay, notifying the Police Board that by proceeding with its disciplinary proceedings it risked prejudice to the ongoing

criminal proceedings and the due process rights of the accused officers. As the Police Board explained in its Memorandum and Order on Motions to Stay, the stay would harm Franko's private interest in continued employment by delaying the final adjudication of the charges against him, but that harm was balanced against the strength of the Police Board's governmental interest in promoting justice in cases of police misconduct, which impelled it to take steps to avoid "prejudic[ing] or jeopardiz[ing]" the ongoing criminal investigation into the McDonald shooting. (*See* Police Bd. Mem. & Order at 1-2.) Further, the Police Board reduced the harm to Franko's private interest by vacating his suspension, clearing the way for him to be reinstated at full pay in the meantime. (*Id.* at 9-10.)

The Court agrees with defendant that this reasoning reflects a balancing of interests that comports with due process. First, as the Police Board recognized, the City's governmental interest in "preserving public confidence in its police force," *see Gilbert*, 520 U.S. at 932, was served not only by its own disciplinary proceedings but also by protecting the integrity of the parallel criminal proceedings arising out of the McDonald shooting, which required staying the disciplinary proceedings. Thus, the reason for the delay was properly closely connected to the "underlying governmental interest." *Mallen*, 486 U.S. at 242.

Plaintiffs argue that Franko was never indicted and he never testified before the grand jury or at Van Dyke's trial, so the Police Board's concern for his due process and self-incrimination rights was misplaced. But plaintiffs' position suffers from hindsight bias because Special Prosecutor's criminal investigation had not concluded in June 2017, nor would it conclude for several more months. Notably, the Police Board's June 2017 decision reflects that, at that time, the Special Prosecutor had not ruled out indicting Franko or the other officers who had been charged before the Police Board. (*See* Police Bd. Mem. & Order at 5.) Further, Van Dyke's trial

did not conclude until October 2018, well over a year later, and the Police Board's decision to stay the accused officers' disciplinary proceedings was based on its regard not only for the rights of Franko and the unindicted officers but also for the rights of Van Dyke. As the Police Board noted, Van Dyke had moved to stay the disciplinary proceedings, arguing that they would "pose a serious or imminent threat of further public condemnation in his case and prejudice him in his upcoming criminal trial" (*id.*), and the Police Board appears to have agreed with him. Even if the Court assumes that there was only a slim chance that media coverage of the officers' disciplinary proceedings might jeopardize any overlapping criminal cases, including Van Dyke's, the Police Board was entitled to conclude that, "[g]iven the importance of the criminal cases involving Mr. McDonald to our city, and the need to determine if criminal liability is appropriate, it would be a disservice to all (Mr. McDonald, his family, the citizens of Chicago, and the officers)" (*id.* at 8) to take even slight risks of prejudicing them, so long as the City maintained a proper balance of its governmental interest in protecting those criminal proceedings against the other relevant due process interests.

In that regard, the Police Board also correctly recognized that the officers' private interest in their livelihoods weighed heavily, *see Loudermill*, 470 U.S. at 543, and an indefinite stay would significantly harm that interest—particularly if the officers remained suspended without pay, a status that would become constitutionally dubious with no post-suspension hearing in sight. *Cf. Gilbert*, 520 U.S. at 932-33 ("the government [did] not have to give [the accused] employee . . . a paid leave at taxpayer expense" while his hearing was pending, where the risk of erroneous deprivation was low *and* a "prompt postsuspension hearing" was likely). Therefore, the City lifted the suspension to remove the obstacle to the officers' livelihoods. This reduced the "harm to [the private] interest occasioned by delay," and given that there was a strong, relevant governmental

interest in favor of the delay, and there remained only a minimal "likelihood that the interim decision [to suspend without pay for misconduct] may have been mistaken," the delay did not offend due process. *See Mallen*, 486 U.S. at 242.

Plaintiffs argue that the Police Board should have reinstated Franko with back pay, but the Court does not agree that due process required it. First, as defendant argues and the Police Board recognized in its Clarification Order, Franko did not ask for back pay prior to the Police Board's June 2017 decision, and the Court agrees that his failure in that regard is significant. *See Jones*, 57 F.3d at 1445 (reasoning that "it is not unduly burdensome to require a person who is deprived of a protected property right to request" the relief he seeks). But regardless, plaintiffs have not demonstrated, and the Court fails to see, why lifting the suspension did not adequately protect Franko's private interest by permitting him to earn a living during the extended delay in his disciplinary proceedings. Critically, nothing about the delay or the reasons for it increased the likelihood of an erroneous deprivation, which remained low, as the results of the OIG investigation had shown. Further, if by some chance Franko ultimately proved at the hearing that the allegations against him were unfounded, the City could award him back pay at that later date. *See Ciechon v. City of Chi.*, 634 F.2d 1055, 1058 (7th Cir. 1980) (citing *Mathews*, 424 U.S. at 340). The Police Board was required to act with due regard for the officers' private interest in their livelihoods, while balancing that interest against the strength of the countervailing governmental interest and the low chances of an erroneous deprivation, and the balance it struck was well within the limits of due process.

Importantly, as defendant correctly argues, the June 2017 decision to lift the suspension was not an admission that his suspension had violated due process; rather, it reflected a re-balancing of the relevant interests and factors in light of changed circumstances, namely, the

Special Prosecutor's suggestion that a need had arisen to delay Franko's hearing to protect the integrity of the ongoing criminal proceedings. That re-balancing did not require, as plaintiffs seem to suggest, the Police Board to cure any and all harm done to Franko's private pecuniary interest since disciplinary proceedings had been initiated against him, nor do plaintiffs cite authority so demonstrating. The closest plaintiffs come is to cite *Jones v. City of Gary, Ind.*, 57 F.3d at 1444, but, while it is true that the suspended employee in *Jones* was reinstated with back pay when his post-deprivation hearing was delayed, nothing in *Jones* required defendant to do the same here. Due process is "flexible and calls for such procedural protections as the particular situation demands," *Mathews*, 424 U.S. at 334 (internal quotation marks omitted), and the Court agrees with defendant that the Police Board's balancing of the relevant interests comported with due process in this case.

Plaintiffs also argue that defendant's justification for the delay was inadequate because the Police Board could have conducted the disciplinary proceedings in private, but again, the Court fails to see why due process required it. Conducting the disciplinary proceedings in private would not have served the relevant governmental interest as effectively; the Police Board can hardly "instill public confidence" in its ability to "ensure that justice is done in cases where officers are accused of misconduct" if it holds disciplinary proceedings out of public view. Additionally, there remained at least some chance that word of the private proceedings might get out, given the intense media interest in the McDonald shooting, which had the potential to prejudice the ongoing criminal proceedings. Given the slight risk of erroneous deprivation, the reduction in harm to Franko's private interest by allowing him to return to work, and the strong governmental interest in holding police disciplinary proceedings that "instill public confidence," the Court concludes that the

possibility of conducting police disciplinary proceedings in private does not alter the balance of the *Mathews* and *Mallen* factors in plaintiffs' favor.

Neither Franko's suspension nor the delay in his ultimate post-suspension hearing violated Franko's due process rights.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants defendant's motion for summary judgment [73] and denies plaintiffs' motion for summary judgment [76].  Civil case terminated.


**SO ORDERED.**                                    **ENTERED: January 21, 2020**

_____
**HON. JORGE ALONSO**
**United States District Judge**